UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Jesse Fabio,

Plaintiff,

vs. ORDER

Credit Bureau of Hutchinson, Inc., a Minnesota corporation, Shawn Stewart, Bruce Johnson, Tom Johnson, and Mr. Palmer,

Defendants. Civ. No. 01-2033 (PAM/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 11th day of September, 2002.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(A), upon the Plaintiff's Motion to Amend his Amended Complaint, so as to plead punitive damages. The Defendants oppose the Motion on both timeliness and substantive grounds. A Hearing on the Motion was conducted on September 5, 2002, at which time the Plaintiff appeared by Thomas J. Lyons, Jr., Esq., and the Defendants appeared by Ryan J. Trucke, Esq. For reasons which follow, we deny the Motion to Amend.

(16)

FILED SEP 11 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. Factual and Procedural Background

The Defendant Credit Bureau of Hutchinson, Inc. ("CBH") was retained, by the TCF Bank, to collect an overdrawn checking account, belonging to the Plaintiff, in the amount of $1,345.29. According to the Record presented, collection letters were sent to the Plaintiff, by CBH, on May 22, 2001, June 5, 2001, and September 12, 2001. These letters appear to be computer generated, and bear the usual trappings of "dunning" letters. In addition, representatives of CBH had telephone contact with the Plaintiff on occasion.

As recounted by the Plaintiff, in his verified Amended Complaint, the Defendant Shawn Stewart ("Stewart"),[1] who is an agent of CBH, advised the Plaintiff, in one phone call, which appears to have occurred after May 22, 2002, that "I've sat on this f**king thing long enough and I can't sit on it anymore," which extremely upset the Plaintiff, and caused him to immediately terminate the call. Plaintiff then called CBH back, and asked to speak with a manager, and he was connected to the Defendant Tom Johnson ("Johnson"). Johnson is alleged, by the Plaintiff, to have denied that Stewart had used offensive language, demanded that the Plaintiff

[1]Notwithstanding the spelling of "Stewart" in the caption of this case, and in the Affidavit of Matt C. Pierce ("Pierce"), who avers, in his Affidavit, to know "Stewart," it appears that the proper spelling of "Stewart," is "Stuart." In the interests of consistency, we spell Stuart's name as it is contained in the caption, and in the averments of Pierce.

pay his debt, and stated that he would make it his "personal conquest" to make sure that the debt was collected. The Plaintiff avers that he repeatedly informed Johnson that the debt was incurred as a result of checks that had been stolen from his house, and that the Plaintiff had reported the theft to the TCF Bank. Johnson is purported to have said that he "did not care" about the stolen checks, but inquired whether the Plaintiff had signed, and filed, an Affidavit of theft with the TCF Bank. The Plaintiff responded that "he had not been allowed to complete this Affidavit because TCF Bank was still investigating the theft of these checks and it had refused to provide him with any affidavit form."

No other telephone contacts are specifically alleged in the Plaintiff's Amended Complaint. Rather, through artful drafting, an impression is left that phone calls, from CBH, were both oppressive and recurrent. For example, in an Affidavit of Matt C. Pierce ("Pierce"), which is attached to the Amended Complaint, Pierce attests to the fact that he was employed by CBH during the period from "March 2001 until around early June 2001." Since the first telephone call, which the Plaintiff alleges to have been received from CBH, occurred after May 22, 2002, Pierce's exposure to any exchanges, between Stewart and the Plaintiff, would have had to have occurred in a relative brief period of time. Unfortunately, neither Pierce, nor the Plaintiff, detail any other dates on which

the Plaintiff was purported to have received an offending telephone call from Stewart, Johnson, or any other representative of CBH.

Instead, Pierce avers that "he was a witness to numerous acts, statements and telephone conversations between Defendant Shawn Stewart and the Plaintiff with regard to the above-named Plaintiff." A close reading fails to disclose whether "numerous" modifies "acts," "statements," or "telephone conversations," or whether the "telephone conversations" were about the Plaintiff, but not to the Plaintiff, by virtue of the closing prepositional phrase "with regard to the above-named Plaintiff." In addition, Pierce avers that Stewart would remark about "Fabio-Time" on "virtually every shift" that Pierce worked with Stewart, and that "'Fabio-Time' occurred at or around 4:00 p.m. or 7:00 p.m.," when Stewart is purported to call the Plaintiff to verbally harass him. Again, there is no allegation as to any occasion on which such a call was actually placed. Rather, Pierce simply avers "[t]hat on one occasion, Defendant Stewart said 'It's time to call Fabio' and laughed very loud;" [t]hat on another occasion, Defendant Stewart said that Fabio had told him that TCF checks were stolen but that Defendant Stewart was going to attempt to collect on them anyway;" and "[t]hat on several occasions, Stewart told the Plaintiff that this debt was on your shoulders, that it was on Plaintiff's credit report, and that it was his responsibility to pay it no matter

what." Again, there is no assertion that these statements by Stewart were contained in any telephone call other than that which the Plaintiff has specifically alleged -- namely, Stewart's telephone call sometime after May 22, 2001.

Rather, Pierce baldly avers "[t]hat the level of harassment which Defendant Shawn Stewart created for Plaintiff, and which I personally witnessed, was enough to drive Plaintiff insane, to file bankruptcy, or even to commit suicide." Pierce asserts that "nearly every time Defendant Stewart initiated a new call to Plaintiff, Defendant Stewart would pretend that he had never spoken to Plaintiff," that he did so even though "the Plaintiff had asked him not to call again," and that, at times, the "Defendant Stewart would change his voice and pretend to be someone named 'Tex' and call Plaintiff to get him to respond." While Pierce contends "[t]hat on numerous occasions [he] heard Defendant Stewart use profanities like 'sh*t, d*mn and h*ll,'" there is no averment, by Pierce, that such language was directed at the Plaintiff.

Lastly, the Plaintiff's Amended Complaint states that two additional collection letters were sent to the Plaintiff on June 5, 2001, and on September 13, 2001.[2] On the basis of these allega-

---

[2]The Affidavit of Pierce also recounts certain collection practices of CBH, but we note that these "practices" do not specifically relate to the Plaintiff, except insofar as Pierce alleges (continued...)

tions, the Plaintiff seeks to amend his Amended Complaint so as to assert a claim for punitive damages in the context of his State law tort claim for "Invasion of Privacy by Intrusion Upon Seclusion."[3]

III. Discussion

A. The Timeliness of the Plaintiff's Motion to Amend.

On June 26, 2002, this matter was reassigned to this Court. In a Pretrial Order dated March 27, 2002, the previous Magistrate Judge directed that "[a]ll motions which seek to amend any pleading or to add any parties must be filed prior to May 1, 2002." Although the Plaintiff did amend his Complaint on January 7, 2002, after the Defendant had filed a Motion to Dismiss, which prompted the Defendant to file its Answer to Amended Complaint, the Plaintiff now again seeks to further amend his Amended Complaint.

Since the Plaintiff's current Motion to Amend was not filed until August 7, 2002 -- some three months after the applicable deadline -- his Motion is untimely given the unambiguous language

---

[2](...continued)
that, notwithstanding notations in the Plaintiff's account that the Plaintiff should not be called, the "Defendant Stewart repeatedly called Plaintiff anyway."

[3]Originally, the Plaintiff had also sought to plead for punitive damages with respect to his claim under the Fair Debt Collection Practices Act, Title 15 U.S.C. §1692 et seq., but he withdrew that aspect of his Motion to Amend during the course of the Hearing before this Court. Accordingly, we only address the Plaintiff's Motion as it relates to his invasion of privacy cause of action.

of the operative Pretrial Order. The Plaintiff argues, however, that the Pretrial Order does not mean what it plainly says, as the previous Magistrate Judge excludes Motions to Amend, so as to plead a claim for punitive damages, from the pleadings deadline. Given the unambiguous language of the Pretrial Order, we have no occasion to ascertain the unexpressed intention of the previous Magistrate Judge. Upon our questioning, neither party represented that any such unexpressed intent was disclosed by the Magistrate Judge during the Initial Pretrial Conference, and no such intention is revealed in the Pretrial Order.[4]

---

[4]We accept that reasonable minds can differ as to the propriety of allowing amendments, so as to plead a punitive damage claim, after the amendment deadline. In our view, such a practice spawns delay, which can be particularly prejudicial to the party facing a newly pled claim for punitive damages. Ordinarily, such a claim is not insurable, at least under Minnesota law, thereby causing any involved insurer to advise of the potential need for separately retained counsel, in order to defend against the request for punitive relief. Newly retained counsel may well regard discovery to be necessary, given the new claims, and we would be hard-pressed to ignore such a request given the dictates of due process. Our view is not altered by the oft-repeated assertion that a punitive damage claim, being fact-dependent, may not be supportable until all discovery has been exhausted -- an occurrence which ordinarily transpires after the expiration of the amendment deadline. In truth, rarely do we confront a punitive damage claim, whose predicate facts were not known prior to the filing of the original Complaint, and if, perchance, newly discovered facts should give rise to the claim for punitive damages, then the "good cause" requirement of Rule 16(b), Federal Rules of Civil Procedure, would be satisfied, and leave to amend would be warranted.

Of course, the deadlines contained in a Pretrial Order may be altered upon a showing of good cause. See, Rule 16(b), Federal Rules of Civil Procedure. "The 'good cause' standard is an exacting one, for it demands a demonstration that the existing schedule 'cannot reasonably be met despite the diligence of the party seeking the extension.'" Scheidecker v. Arvig Enterprises, Inc., 193 F.R.D. 630, 631 (D. Minn. 2000), quoting Archer Daniels Midland v. Aon Risk Services, Inc., 187 F.R.D. 578, 581-82 (D. Minn. 1999). Here, the Plaintiff cannot substantiate any "good cause" for the late filing of his Motion to Amend, on grounds that discovery would not have allowed the amended claim. The bases for the newly proposed Second Amended Complaint were either contained in his Amended Complaint, or were contained in the Affidavit of Pierce, which was attached to his Amended Complaint. We understand that the Plaintiff did not have to seek leave for the filing of his Amended Complaint, but he certainly cannot contend that his current Motion is dependent upon newly discovered facts. See, West Professional Education Group, Inc. v. Harcourt Brace Legal and Professional Publications Inc., 1995 WL 422651 *13 n. 7 (D. Minn., June 2, 1995), citing 6 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §1438 at pp. 544-86 (1990), and cases cited therein.

We do find cause for the late filing, however, on the basis of a letter that Plaintiff's counsel received from the previous Magis-

trate Judge, in unrelated litigation. In that letter, which is dated April 28, 1998, the previous Magistrate Judge stated, in part, as follows:

> Please be advised that this letter should make clear that any cut-off on motions to amend the complaint does not refer to punitive damages. That motion can be sought at any time in the life of the pleading. I had hoped that we had made that clear at the time of our meeting and that it did not require further written amplification, but in any event this letter shall serve as a further written clarification on that point.

Although the Plaintiff presents no showing that the previous Magistrate Judge would hold the same view in this case -- which was commenced several years after the Magistrate Judge's amplification of his Pretrial Order -- we can understand the Plaintiff's reliance on that amplification. Accordingly, we turn to the merits of the Plaintiff's Motion to Amend.

B. The Merits of the Plaintiff's Motion to Amend.

Since the Plaintiff seeks to append a punitive damage claim to his State law tort action for invasion of privacy, our analysis of that Motion is governed by Minnesota Statutes Sections 549.191 and 549.20. See, Hern v. Bankers Life Cas. Co., 133 F. Supp.2d 1130, 1134 (D. Minn. 2001). "Under the Section 549.20 standard, the Court 'is required to search for evidence which is "clear and convincing,"'" and "[t]o be 'clear and convincing' there must be 'more

than a preponderance of the evidence but less than proof beyond a reasonable doubt.'" Olson v. Snap Products, Inc., 29 F. Supp.2d 1027, 1036 (D. Minn. 1998), quoting Ulrich v. City of Crosby, 848 F. Supp. 861, 868 (D. Minn. 1994), quoting in turn, Weber v. Anderson, 269 N.W.2d 892, 895 (Minn. 1978). In addition, "[u]nder the strictures of Section 549.191, 'the Court reviews the evidence in support of a Motion to Amend as the Court would review a Motion for a Directed Verdict * * *." Hern v. Bankers Life Cas. Co., supra at 1134, quoting Ulrich v. City of Crosby, supra at 867; see also, Swanlund v. Shimano Indus., Corp., Ltd., 459 N.W.2d 151, 154 (Minn. App. 1990), rev. denied (Minn., October 5, 1990). "Thus, as we have observed in prior cases, in reaching such a determination, the Court makes no credibility rulings, and does not consider any challenge, by cross examination or otherwise, to the plaintiff's proof." Id. at 1134 n. 2. As our Court of Appeals has recognized, the statutory procedures of Sections 549.191, and 549.20, was "enacted to prevent frivolous punitive damage claims by allowing a court to determine first if punitive damages are appropriate." Gamma-10 Plastics, Inc. v. American President Lines, Ltd., 32 F.3d 1244, 1255 (8th Cir. 1994), citing Bougie v. Sibley Manor, Inc., 504 N.W.2d 493, 499 (Minn.App. 1993).

Accordingly, we look to the Plaintiff's Motion papers to ascertain whether he has alleged a valid entitlement to plead puni-

tive damages. Under Minnesota law, "[i]ntrusion upon seclusion occurs when one 'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns * * * if the intrusion would be highly offensive to a reasonable person." Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231, 233 (Minn. 1998), quoting Restatement (Second) of Torts, §652B (1977). "The tort has three elements: (a) an intrusion; (b) that is highly offensive; and (c) into some matter in which a person has a legitimate expectation of privacy." Swarthout v. Mutual Service Life Ins. Co., 632 N.W.2d 741, 744-45 (Minn.App. 2001), citing Fletcher v. Price Chopper Foods, 220 F.3d 871, 875 (8th Cir. 2000).

Both the State, and Federal Courts of Minnesota, have recognized that there is some objectively-based threshold degree of repugnance that is required to sustain a claimed intrusion on seclusion. As the Court explained, in Bauer v. Ford Motor Credit Co., 149 F. Supp.2d 1106, 1109 (D. Minn. 2001), quoting Miller v. National Broad. Co., 187 Cal.App.3d 1463, 232 Cal.Rptr. 668, 678 (1986), rev. denied (March 11, 1997), "[w]hile what is 'highly offensive to a reasonable person' suggests a standard upon which a jury would properly be instructed, there is a preliminary determination of 'offensiveness' which must be made by the court in discerning the existence of a cause of action of intrusion." See also, Swarthout v. Mutual Service Life Ins. Co., supra at 745 ("In

the context of intrusion upon seclusion, questions about the reasonable person standard are ordinarily questions of fact, * * * but they become questions of law if reasonable persons can draw only one conclusion from the evidence.”), quoting Hougum v. Valley Mem. Homes, 574 N.W.2d 812, 818 (N.D. 1998). Indeed, in Phillips v. Grendahl, 2001 WL 1618593 *2 (D. Minn., May 3, 2001), the Court determined that the alleged invasion of privacy, which entailed a search into the background of a daughter’s fiancé, was not, “as a matter of law,” “highly offensive to a reasonable person.”

While, given the Record presented, we have grave doubt that the Plaintiff has alleged a viable intrusion on seclusion claim, we need not, and do not, proceed so far, as the Defendant has not moved to dismiss that claim, as it has been framed in the Plaintiff’s Amended Complaint, and as the Plaintiff has, verbatim, alleged the claim in his proposed Second Amended Complaint. To be sure, a Motion to Amend may be granted on futility grounds, see Becker v. Univ. of Nebraska at Omaha, 191 F.3d 904, 908 (8th Cir. 1999), but we leave that issue unresolved, as unnecessary to our disposition of the Plaintiff’s current Motion. Rather, we conclude that the Plaintiff has not demonstrated a “clear and convincing” showing that he is entitled to plead a claim for punitive damages.

As we have detailed, shorn of the hazy puffery of advocacy, the proposed Second Amended Complaint, and accompanying Exhibits,

identify only two specific telephone exchanges between the Plaintiff and representatives of CBH, and only one of them could be properly characterized as an "intrusion." As the Court recognized, in Bauer, "any contacts initiated by plaintiff[] [himself] cannot be included in the tally of intrusive contacts." Bauer v. Ford Motor Credit Co., supra at 1110, citing Mlynek v. Household Fin. Corp., 2000 WL 1310666 * 3 (N.D. Ill., September 13, 2000)("[O]f the three phone conversations alleged in the instant case, two were initiated by plaintiff himself, making only one a truly unauthorized intrusion."). While the Plaintiff intimates that other telephone exchanges, between himself and CBH representatives, were conducted, he has not pled any in a manner that is either "clear" or "convincing."

Rather, the Plaintiff, employing Pierce as some form of pleading surrogate, relies upon such conclusory assertions as Pierce's subjective reaction that Stewart's harassment, which Pierce "personally witnessed, was enough to drive Plaintiff insane, to file bankruptcy, or even to commit suicide." Unfortunately, Pierce does not relate the foundation upon which this pronouncement is based, and given the fact that, after May 22, 2001, when the Plaintiff alleges that he first received a telephone call from Stewart, Pierce was only in the employ of CBH until "early June 2001." As we have related, our review of the showings, which underlie a

Motion to plead punitive damages, is both exacting and thorough. To accept Pierce's conclusions, without a particularized, and cogent basis to support them, would relegate our review to the "rubber stamp" that has been flatly denounced by the Minnesota Supreme Court.[5] See, Shetka v. Kueppers, Kueppers, Von Feldt and Salmen, 454 N.W.2d 916, 918 n. 1 (Minn. 1990); see also, Richardson v. Cardiac Surgical Associates, P.A., 2002 WL 737505 *2 (D. Minn., April 24, 2002).

The Restatement (Second) of Torts, upon which the Minnesota Supreme Court relied in adopting the tort of intrusion on seclusion, has illustrated the notion of repugnance, or offensiveness, as follows:

> There is * * * no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reason-

[5]We note that, in opposing this Motion, the Defendants have proffered the Affidavit of Michael Peterson ("Peterson"), who is the President of CBH. Peterson avers that CBH sent collection letters to the Plaintiff on August 30, October 5, and November 6, 2000. In addition, Peterson details three telephone contacts with the Plaintiff. The first on "February 28, 2001, at 4:27 p.m.," the second "on May 23, 2001, at 2:48 p.m." -- which was assertedly initiated by the Plaintiff -- and the last on June 6, 2001, which, purportedly, was also initiated by the Plaintiff. Given the framework of our analysis, we have given Peterson's averments no weight. We note these averments, in conjunction with those contained in the papers filed by the Plaintiff, as one, or the other set of representations, may well warrant future review under the proscriptions of Rule 11(b), Federal Rules of Civil Procedure.

> able man would strongly object. Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.

Restatement (Second) of Torts §652B cmt. d.

Given the lack of particularization in the Plaintiff's Motion papers, we find no more than one telephone contact to have been identified, by the Plaintiff, as an unwanted intrusion -- the return telephone call was initiated by the Plaintiff, and was not intrusive to his privacy. While we are mindful, that Stewart is alleged to have employed language, in the telephone conversation, that he initiated, that if accurate, is offensive and not to be condoned, we are unable to find that the language would have been "highly offensive to the ordinary reasonable man." The language is both socially inappropriate, and unnecessary, but the same epithets are, unfortunately, strewn to society's exposure in print, film, and television and radio dialogue. The employment of that language, as a single instance, is not the sort of "highly offensive" conduct that prompted the adoption of the intrusion on seclusion tort -- Lake makes that plain.[6]

---

[6]We think it foolhardy to analogize the language said to have (continued...)

In sum, the Plaintiff's Motion papers have not provided "evidence sufficient to permit the Jury to conclude that it is 'highly probable' that the defendant acted with deliberate disregard to the rights or safety of others * * *." Ulrich v. City of Crosby, supra at 868, quoting Becker v. Alloy Hardfacing & Engineering Co., 401 N.W.2d 655, 659 (Minn. 1987); see also, Bunker v. Meshbesher, 147 F.3d 691, 696 (8th Cir. 1998)("Under Minnesota law, a trial court 'may not allow an amendment [of the complaint to add a punitive damages claim] where the motion and supporting affidavits "do not reasonably allow a conclusion that clear and convincing evidence will establish [that] the defendant[s] acted with willful indifference"' to the rights or safety of others."), quoting Swanlund v. Shimano Indus. Corp., supra at 154. Accordingly, the Motion to Amend is denied.

NOW, THEREFORE, It is --

---

[6](...continued) been uttered here, with the surreptitious exposure of nude photographs of an unsuspecting person to the general public. Some conduct is "highly offensive," and some other conduct is flatly not. See, Lake v. Wal-Mart Stores, Inc., 582 N.W.2d 231 (Minn. 1998).

ORDERED:

That the Plaintiff's Motion to Amend his Complaint to plead a claim for punitive damages [Docket No. 11] is DENIED.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE